**BLACKHAWK INDUSTRIES PRODUCTS GROUP UNLIMITED LLC, Plaintiff,**

v.

**UNITED STATES GENERAL SERVICES ADMINISTRATION, Defendant.**

**No. CIV.A. 2:04CV383.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Nov. 9, 2004.

Thomas Brian Kelly, Jerry L. Bowman, Bowman Green Hampton & Kelly, PLLC, Chesapeake, VA, Russell J. Gaspar, Andrew J. Mohr, Cohen Mohr LLP, Washington, DC, for Plaintiff.

Lawrence R. Leonard, Managing Assistant United States Attorney, Norfolk, VA, for Defendant U.S.

Lee W. Crook, III, Assistant Regional Counsel, Fort Worth, TX, for Defendant U.S. General Services Admin.

### CORRECTED OPINION AND ORDER

MORGAN, District J.

This matter comes before the court on Plaintiff Blackhawk Industries Products Group Unlimited LLC's ("Blackhawk") Motion for a Preliminary Injunction, filed on June 29, 2004. Blackhawk seeks to enjoin Defendant United States General Services Administration ("GSA") from removing Blackhawk's products from the Federal Supply Group 84 ("FSG 84") Schedule on the basis of their manufacture in Vietnam. Blackhawk asserts that its products are "war materials" and, therefore, exempt from the Trade Agreements Act ("TAA"), 19 U.S.C. § 2501, *et seq.*

During a hearing conducted on July 26, 2004, the Court GRANTED Plaintiff's Motion for a Preliminary Injunction. This Order sets forth the factual findings of the Court and explains the rationale for the ruling on the motion.

### PROCEDURAL BACKGROUND

Blackhawk filed the instant motion along with a Motion for a Temporary Restraining Order ("TRO") on June 29, 2004. During a hearing conducted on July 1, 2004, the Court granted Blackhawk's Motion for a TRO, thereby temporarily enjoining GSA until July 12, 2004. On July 9, 2004, the Court entered an Agreed Order by the parties extending the TRO until July 23, 2004 and setting a hearing on the preliminary injunction for July 26, 2004. On July 9, 2004, GSA responded in opposition to Blackhawk's Motion for a Preliminary Injunction; Blackhawk replied on July 15, 2004.

### Factual Background [1]

Blackhawk manufactures, markets, and sells tactical products including assault vests, equipment harnesses, packs, hydration systems, holsters, equipment and ammunition pouches, rifle slings, Kevlar gloves and similar items designed primarily for military combat use, but usable by law enforcement and related entities as well. (Noell AFF [2] ¶ 2.) It is currently an approved supplier of such products through six Multiple Award Schedule ("MAS") contractors holding FSG 84 Schedule contracts, and has been such since 1996. (Noell AFF ¶ 4.) These contracts allow federal agencies, departments, and offices to order products such as Blackhawk's without having to complete the steps necessary for non-Schedule purchases. (Exh. B to Pl. MEMO [3].) The TAA prohibits federal agencies from purchasing products from countries that have not signed the Agreement on Government Procurement ("AGP"). 19 U.S.C. § 2512. Vietnam has not signed the AGP. As implemented by the Federal Acquisition Regulations ("FAR"), the TAA does not apply to the "acquisitions of arms, ammunition, or war materials, or purchases indispensable for national security or for national defense purposes...." FAR § 25.401(a)(2).

This regulation is grounded in the text of the AGP and the legislative history of the TAA.[4] AGP Article VIII § 1, entitled "Exceptions to the Agreement" states:

1. Nothing in this Agreement shall be construed to prevent any Party from taking any action or not disclosing any information which it considers necessary for the *protection of its essential security interests relating to the procurement of arms, ammunition or war materials, or to procurement indispensable for national security or for national defence purposes. Id.* (Emphasis added)

Further, the legislative history of TAA provides several references to exempting products for purposes of national security in Senate Report 96–249 (1979) ("SR"). Some of these references are directly related to the referenced exemption in the AGP.

For example, after describing what the AGP will cover, the SR states "It will not cover the procurement of arms, ammunition, war materials, and purchases indispensable for national security or national defense purposes." Summary of the Agreement, Title III Government Procurement, s. REP. No. 96–249 at 130. Also, in another section that summarizes the AGP, the SR states, "The agreement does not cover: A. Procurement of arms, ammunition, war materials, and procurements indispensable for national security or national defense purposes." See Title III—Agreement on Government Procurement, I. Summary, s. REP. No. 96–249 at 466. In describing section 301(a) of the TAA (19 U.S.C. § 2511(a)), the report describes

---

1. These facts are those presented by the parties in their pleadings and at the hearing. The Court's findings of fact and conclusions of law are detailed later in this Order.

2. "Noell AFF" refers to Affidavit of Michael M. Noell in support of Motion for Temporary Restraining Order and Preliminary Injunction, subscribed June 22, 2004, Exhibit A to Memorandum in Support of Plaintiff's Motion for Temporary Restraining Order and a Preliminary Injunction, received June 29, 2004.

3. "Pl. MEMO" refers to Memorandum in Support of Plaintiff's Motion for Temporary Restraining Order and a Preliminary Injunction, received June 29, 2004.

4. The TAA approved several trade agreements negotiated by the President under the Trade Agreement Act of 1974, one of which is the AGP.

how the President will have authority to waive the Buy American Act for purchases covered by the AGP. The report then distinguishes between those purchases covered by the AGP and those not covered: "Purchases covered by the Agreement are those made by the U.S. agencies designated in the agreement that are greater than 150,000 SDR's (approximately $190,000), and not subject to an exclusion, such as national security and small or minority businesses setasides." See General Authority to Modify Discriminatory Purchasing Requirements (Section 301 of the Bill), Title III. Government Procurement. s. REP. No. 96–249 at 132.

Further, in describing the signatories' government procurement markets, the report reveals that major signatories were particularly concerned about excluding purchases affecting national security from the AGP. See Analysis of Potential Benefits to the United States, s. REP. No. 96–249 at 141. ( "In general, major signatories have agreed to coverage of most purchases of goods by their central government ministries and departments—excluding national security purchases." *Id.*). The report goes on to explain how much of the U.S. government procurement market will be opened by the AGP:

> In other terms, we have offered approximately 15 percent of our total procurement market. This offer includes coverage of most executive agencies with some important exceptions. The 85 percent which will not be covered includes these exceptions as well as purchases of services, construction contracts, and purchases excluded on national security grounds. *Id.* at 142; *id.* at 527.

Other references in the SR, while not specific to the AGP, reveal Congress's concern with national security and its interest in excepting from treaty obligations goods necessary for national security.

In describing the trade restrictions on civil aircraft allowed under the Civil Aircraft Agreement [5], the SR states that export restrictions for commercial or competitive reasons will not be allowed, but "export licensing procedures for reasons of national security or foreign policy are not affected." Summary of the Agreement (Civil Aircraft Agreement), s. REP. No. 96–249 at 186. Further, "the agreement will improve the competitiveness of U.S. products and maintain efficiency in an industry particularly important to the national security." s. REP. No. 96–249 at 507–08.

In describing the code established as part of the United States Multi–National Agricultural Package under the TAA, the SR again emphasizes a concern with national security. "Signatories shall attempt to harmonize technical standards and certification systems insofar as possible, provided that such harmonization is not inappropriate for reasons such as national security, prevention of deceptive practices, protection of human health or safety, animal or plant life or health, or the environment." Views of the Committee on Agriculture, Nutrition, and Forestry on Agriculture and the Multilateral Trade Negotiations: The U.S. Agricultural MTN Package Code. s. REP. No. 96–249 at 209. "Obligations under the code will not apply to those procurements for which there are national security considerations." *Id.* at 210.

In 2001, Blackhawk moved its production facility from Korea to Vietnam after confirming with GSA that Vietnam was an acceptable trading partner because it had entered into a Bilateral Trade Agreement with the United States in 2001. (Noell

---

5. One of the agreements approved by the TAA.

AFF ¶¶ 9, 10; Exh. 1 to 1st Stoker.[6]) On October 8, 2003, Blackhawk contacted GSA concerning its threatened removal of Blackhawk's products from the FSG 84 Schedule because Vietnam was not an approved country under the TAA. (October 8, 2003 email correspondence, Exh. 7 to 1st Stoker.) On October 14, 2003, Blackhawk requested that GSA recognize an exemption from the TAA because its products were "war materials." (Exh. 8 to 1st Stoker.) Alternatively, Blackhawk requested that GSA allow Blackhawk's products to remain on the FSG 84 Schedule because there was an insufficient supply from other vendors to fulfill the government's requirements. (*Id.*) Shaloy Castle–Higgins, Supervisory Contract Specialist with GSA, told Blackhawk that if it provided sufficient testimonial evidence of its products being war materials that it may receive the exemption. (Castle–Higgins[7] ¶ 13.) Thereafter, Blackhawk provided letters from a number of individuals indicating their support for Blackhawk's products and for the "war material" exemption for those products. (Att. 2 & 3 of Exh. 16 to 1st Stoker.)

Upon reviewing the letters, GSA Regional Counsel Jerry Ann Foster determined that Blackhawk's evidence did not support an exemption. (Exh. 16 to 1st Stoker.) Ms. Foster, however, has based her determination on two factors that do not appear on the face of FAR § 25.401(a)(2). First, she noted that the "products manufactured by Blackhawk are produced legally for supply by other manufacturers." (May, 7, 2004, email from Jerry Ann Foster to Carl Kline, Exh. 11 to 1st Stoker.) This conflicts with a statement by Shirley Hardy, a Procurement Analyst. Hardy stated: "is Vietnam [Blackhawk] the only source or major source of these items? [then correcting herself] This probably won't make a difference since any item that is determined to fit into this category is exempt from the TAA requirement." (November 19, 2003, email from Shirley Hardy to Shaloy Castle–Higgins, Exh. 11 to 1st Stoker.) Secondly, Ms. Foster stated that the "unless a very high Government official from DOD (Sec. of Defense or Undersecretary of Defense) could write a letter stating brand Blackhawk products were indispensable for national defense or security, then the TAA exception would not even be considered by the CO." (May, 7, 2004, email from Jerry Ann Foster to Carl Kline, Exh. 11 to 1st Stoker.)

On May 27, 2004, Castle–Higgins formally notified Blackhawk that GSA was denying Blackhawk's request to keep its products on the FSG 84 Schedule. (Exh. 19 to 1st Stoker.) On May 28, 2004, Stoker sent a letter to all FSG 84 contractors requiring that they identify within ten days any products manufactured in Vietnam so that they could be removed from the contract schedule. (Exh. 20 to 1st Stoker; 2nd Stoker[8] ¶ 24; Noell TRO ¶ 14.) In a June 11, 2004 letter, Blackhawk urged its dealers to indicate that none of the products on the Schedule violated the TAA. (Exh. 23 to 1st Stoker; 2nd Stoker ¶ 25.) Upon learning of this, Stoker sent a letter dated June 29, 2004 informing the dealers that Blackhawk had not been granted the exemption and that they should identify the products accord-

---

6. "1st Stoker" refers to First Declaration of Kellie M. Stoker in Opposition to Motion for Preliminary Injunction, filed July 12, 2004.

7. "Castle–Higgins" refers to Declaration of Shaloy Castle–Higgins, filed July 12, 2004.

8. "2nd Stoker" refers to Second Declaration of Kellie M. Stoker in Opposition to Motion for Preliminary Injunction, filed July 12, 2004.

ingly. (Exh. 25 to 1st Stoker; 2nd Stoker ¶ 26.)

### STANDARD OF REVIEW

 The purpose of a preliminary injunction is generally to maintain the status quo until a final trial on the merits can be held. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir.1999). A preliminary injunction is intended "to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit." *In re Microsoft Corp. Antitrust Litigation*, 333 F.3d 517, 525 (4th Cir. 2003). It is justified "only insofar as it aids the court in granting final relief." *Id.* However, preliminary injunctions, unlike temporary injunctions, may be of infinite duration. *Hoechst*, 174 F.3d at 422. Preliminary injunctions fall within the scope of Federal Rule of Civil Procedure 52(a) and require the court to issue findings of facts and conclusions of law. *Id.* at 421; *Mayo v. Lakeland Highlands Canning Co.*, 309 U.S. 310, 316, 60 S.Ct. 517, 84 L.Ed. 774 (1940).

 In assessing the merits of a motion for a preliminary injunction, the Fourth Circuit has developed the four factors and balancing test as described in *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir.1977). *Edmonds v. Gilmore*, 988 F.Supp. 948, 955 (E.D.Va.1997); *Railway Labor Executives' Ass'n v. Wheeling*, 736 F.Supp. 1397 (E.D.Va.1990). In reviewing a motion for a preliminary injunction a court must consider: (1) the likelihood of irreparable harm to the plaintiff; (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest. *Blackwelder*, 550 F.2d at 193.

 The most important consideration is balancing the harm to the plaintiff against the harm to the defendant. Consequently, a court must first address this balancing of the equities and then weigh the remaining factors accordingly. If the balance tips decidedly in favor of the plaintiff, he need not demonstrate a likelihood of success, but only that serious questions are raised by his complaint; it will "be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Blackwelder*, 550 F.2d at 195; *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 271 (4th Cir.2002). When the balance of hardship "does not tilt decidedly in plaintiff's favor," then a plaintiff must demonstrate a "strong showing of likelihood of success" or a "substantial likelihood of success" by "clear and convincing evidence" in order to obtain relief. *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 818 (4th Cir.1991) (internal quotation marks and citations omitted). Finally, the court must always keep in mind the public interest. In these difficult times, the public interest is most important as it involves the availability of materials allegedly crucial to the war effort, national security and national defense.

### I. BLACKWELDER ANALYSIS

In its brief and at the hearing, GSA raised jurisdictional, as well as substantive, arguments. The parties have not had an opportunity to fully brief and argue the jurisdictional issue. Accordingly, the Court established the briefing and hearing schedule detailed in the Conclusion section of this Order, and reserves its ruling on the jurisdictional issue. However, the Court will decide the substantive issues subject to a decision on jurisdiction.

Blackhawk seeks to maintain the status quo that has existed since 2001. The status quo is that Blackhawk's products were included on the FSG 84 Schedule even

after GSA was advised that they were manufactured in Vietnam. At the preliminary injunction hearing of July 26, 2004, the Court DIRECTED that the case be placed on an expedited trial schedule and that the Rule 16(b) Scheduling Conference commence immediately following the hearing. At that conference, trial was set for January 25, 2005 at 10:00 a.m. The Court also set a hearing for October 29, 2004 at 10:00 a.m. on the jurisdictional issue raised by GSA. Blackhawk's request, if granted, will allow its products to remain on the schedule subject to a decision on the jurisdictional issue or a later decision on the merits.

### A. BALANCING OF HARDSHIPS: BLACKWELDER FACTORS 1 AND 2

Blackhawk's evidence of imminent and irreparable harm remains unchanged from that presented at the TRO hearing, and the Court again FINDS hardship as outlined in its opinion of July 6, 2004. GSA argues that the government will be harmed if the preliminary injunction is granted. GSA's argument is that other suppliers of similar products will request the same exemption of their products under the "war materials" exemption. The Court FINDS that this is not evidence of harm to GSA, since products proven to be within the "war materials" exemption are intended to be exempted under existing FAR regulations.

### B. LIKELIHOOD OF SUCCESS: BLACKWELDER FACTOR 3

Blackhawk argues that the Contracting Officer's ("CO") interpretation of the war material exemption was arbitrary and capricious because it limited the application to products used by DoD exclusively in the war environment. This interpretation reads out the FAR language which includes, "...purchases indispensable for national security or for national defense purposes...". Under *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), an agency decision must be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2). If a product qualifies under the FAR exemption, then GSA does not have the discretion to remove it from the Schedule.

### 1. DEFINITION OF "WAR MATERIALS"

The two employees upon whose affidavits GSA relies both adopt an interpretation of the "war materials" exemption in the FAR that ignores the express language of the regulation. FAR 25.401(a)(2) exempts those "... acquisitions of arms, ammunition, or war materials, or purchases indispensable for national security or for national defense purposes..." Yet the affidavits do not recognize "... purchases indispensable for national security or for national defense purposes..." and focus only on the short hand term "war materials." [9] (Castle–Higgins ¶ 10. Blackhawk's products were "not used exclusively by the DoD for military purposes and were not used exclusively in a war environment."); (2nd Stoker ¶ 39. "[W]e

---

**9.** The Court makes frequent reference to two GSA employees who filed affidavits in support of GSA's position. To the extent that the Court finds their definition of "war materials" and their procedures for exempting "war materials" arbitrary and capricious, the Court further observes that GSA had no established definition for "war materials" and no established procedure for exempting items found to be "war materials." Accordingly it was GSA's complete failure to furnish guidance to these individuals which led to the arbitrary and capricious outcome, not any shortcoming on the part of either individual.

define war materials as those items used only by DoD in a war situation.".) (*See also* 2nd Stoker ¶ 11.) In fact, Stoker determined that products used by agencies, such as the Border Patrol, U.S. Marshals Services, FBI, Secret Service, and state, county, city and local law enforcement, did not meet the FAR definition of "war materials," (2nd Stoker ¶ 12, 13); however, she ignores the fact that these agencies play important roles in both national defense and national security. Stoker further demonstrates that she does not consider the "war materials" exemption to include national security or national defense, by sending a letter to law enforcement equipment contractors advising them that the TAA applied to their contract without mention of the potential involvement of the "war materials" exemption. (2nd Stoker ¶ 24.)

While Castle–Higgins does mention "purchases indispensable for national security" or "for national defense purposes" in ¶¶ 19 and 23 of her affidavit, her other statements prove she is following the lead of her supervisor Stoker. For example in ¶ 19 she describes Blackhawk's products as "commercial in nature" and "not used *exclusively* (emphasis added) by the DoD for military purposes in a war environment." (Compare with 2nd Stoker ¶¶ 9, 11, & 39.)

Castle–Higgins and Stoker's motivation for their disregard of the national security and national defense language (they define war materials "as those items used only by DoD in a war situation," 2nd Stoker ¶ 39) appears to be based on a concern that others will seek exemption for their products if Blackhawk products are exempted. (Castle–Higgins ¶ 23; 2nd Stoker ¶¶ 34, 35, & 36.) Stoker states, "[I]f I had to use a broad definition such as 'they are used by soldiers in Iraq,' I would be faced with an enormous increase in non-designated country items proposed for addition to the schedule." (2nd Stoker ¶ 36.) Further, if Blackhawks' products were granted an exemption, she would "then have to consider any and all requests to add products from non-designated countries to existing contracts or enter into new contract awards for products from non-designated countries if the vendor could simply prove that their product was used the by soldiers in a war theatre." (2nd Stoker ¶ 34.) The prediction that other suppliers might seek exemption under the "war materials" definition is not a justification for arbitrarily ignoring the national defense and national security provision.

In the absence of any other regulation defining "war materials," the DFAR provides a list of categories of items on FSG Schedules that are subject to trade agreements. The DFAR explicitly states that "[i]f an end product is not listed in one of the listed groups, the trade agreements do not apply." DFAR § 225.401–70. Blackhawk argues that because its products are not specifically listed in the applicable FSG, pursuant to the DFAR, the TAA does not prohibit procurement of the products by DoD. The DFAR clearly applies to non-Schedule acquisitions made by DoD. Stoker stated that "[i]f the DoD CO determines that an items (*sic*) is a 'war material,' then the DoD CO can apply the DFARS exception to TAA to that individual procurement." (2nd Stoker ¶ 29.) However, Stoker also noted that an exemption could not be granted solely for Blackhawk products, but must be given to all similar products of other manufacturers, and that, under a GSA Schedule, the exemption could not be limited to purchases by DoD. (*Id.* ¶¶ 14–16, 18.) According to Stoker, because GSA "cannot apply exemptions on a case-by-case basis, any exemption granted must apply to ALL schedule users, civilian and military." (*Id.* ¶ 39.) At the hearing, GSA's counsel indicated that the individual CO for each of the numerous

executive branch agencies served by GSA has the authority to independently decide the definition of "war materials" for purposes of an exemption from TAA. This raises the specter of inconsistent and conflicting decisions. On the one hand, Stoker says there must be a uniform GSA rule for DoD and civilian agencies; on the other hand GSA argues that each agency CO must decide for itself. In either event GSA declined to look to the DFAR for guidance, although it instructed Blackhawk to obtain documentation from DoD officials who presumably would be guided by the DFAR.

### 2. PROCEDURE FOR CONSIDERING EXEMPTION

In addition to substantive due process problems with the definition of the short hand term "war materials," there are procedural due process concerns with GSA's decision making process. The first problem relates back to the definition itself, as Stoker stated "I have no specific guidance to define" what a "war material is . . .", and she goes on to opine that "I would be faced with an enormous increase . . . to the

schedule." (2nd Stoker ¶ 36), if she included national security and national defense items in the definition.

Thus the process begins with an ad hoc definition driven by a desire to limit the number of exemption requests. Guidance on the procedural aspect is similarly vague. Castle–Higgins states ". . . I began researching the FAR to review the procedures for requesting a waiver or exemption to TAA. I discovered that previous FAR requirements for waiver to TAA no longer existed and regulatory guidance was very limited." (Castle–Higgins ¶ 6.) "I requested guidance . . . received a response . . . advising that if the items are determined to meet the exception (sic exemption) definition, there is *no FAR or GSAM guidance for waivers* (emphasis added) and the contracting officer is responsible for making the determination after conducting market research." (Castle–Higgins ¶ 7.)

There being no guidance, GSA decided that letters stating the items were war materials were necessary. When Blackhawk supplied such letters,[10] (see Exh. B

---

10. Letter from Senator John Warner (recognizing the use of Blackhawk's equipment by "military forces," "our special operations community," and "many federal police enforcement agencies who operate in a homeland defense capacity" and that the equipment "appears to be 'war materials'"). Letter from Congressman Edward Schrock (stating that the Blackhawk products in question are "'war materials' or 'purchases indispensable for national security' or 'for national defense purposes'" and that "removing BHI's products from the GSA Schedule would be detrimental to the ability of our special operations soldiers and tactical law enforcement teams to procure the best equipment they require)." Letter from Mitchell L. WerBell, President of BrigadeQuartermasters. BrigadeQuartermasters is a GSA contract schedule holder that receives equipment from Blackhawk. (urging GSA to determine that Blackhawk's products "fit within the exception" as

Blackhawk products are used by military units and Blackhawk "has a good track record of carrying inventory for fast delivery, something that many other concerns can not do.") Lieutenant Thomas J. Sullivan, U.S. Secret Service (stating that "many federal law enforcement personnel in my agency use those products in serving and completing their missions" and that the products in question are "war materials or purchases indispensable for national security or for national defense purposes."). Form Letters from Sergeant First Class Rocky Senatore; Master Sergeant Carl T. Gingola, Chief, Internal Security Branch United States Central Command; D. Stevenson, Sales Manager Diamondback Tactical (stating that "the absence of [Blackhawk] products would seriously undermine the ability of the members of the armed forces to complete their jobs as safely and effectively as they now can" and that the

to Carp AFF [11]), GSA rejected them because they were, in part, from end users and gratuitously concluded"... had obviously been written by Blackhawk." (Castle–Higgins ¶ 8.) One reason for this rejection is clearly wrong (not all are "end users") and the other reason is inconsequential since Blackhawk was told to by GSA what the letters should say.

Stoker advised Blackhawk that she "needed documentation from DoD to support that they used these items in war operations." (2nd Stoker ¶ 21.) Castle–Higgins indicated to Blackhawk that she "would prefer to have letters from procurement officials." (Castle–Higgins ¶ 13.) Mr. Thomas M. O'Sullivan, Blackhawk's Director of Military and Government Programs, requested "letter[s] supporting the fact that the products sold by Blackhawk are 'war materials or material essential for national defense'" from several senior acquisition officials and high ranking officers and executives of the United States Armed Forces through their executive officers or assistants. (O'Sullivan AFF [12] ¶ 4.) According to Mr. O'Sullivan, "[e]ach of the individuals expressed initial support, familiarity with Blackhawk products and a belief that their commanding officers would draft an appropriate letter to GSA." (Id. ¶¶ 5, 6; May 11, 2004 email correspondence, Exh. A to O'Sullivan AFF.) Mr. O'Sullivan was informed later that one of the letters would not be sent "because of objections by lawyers within the Department of Defense." (Id. ¶ 7.) Apparently, "the Judge Advocate General attorneys were concerned that any letter to the GSA

would violate the Department of Defense Ethics regulations that prohibit a Department of Defense employee ... from directly or indirectly endorsing a product." (Id. ¶ 7; May 18, 2004 email correspondence, Exh. B to O'Sullivan AFF.) Mr. O'Sullivan implored that "a generic letter defining any of this type product as war materials and sent directly to GSA would satisfy the requirement." (Id. ¶ 8.) Even so, "the DoD officials said they could not go against the opinion of the attorneys." (Id.) Therefore, Blackhawk was prevented from complying with the GSA request to provide supporting documentation.

GSA thereby invented an ad hoc process and when Blackhawk complied, GSA gratuitously accused it of fabricating the evidence and found such evidence insufficient. GSA then asked for additional documentation from higher DoD officials when it should have known DoD counsel had instructed such officials to not supply the information. (May 18, 2004 email correspondence, Exh. B to O'Sullivan AFF.) The Court FINDS the applied definition of "war materials" and this procedure both arbitrary and capricious.

### C. PUBLIC INTEREST

Blackhawk states that its products are of high quality and for that reason are relied on by the United States Armed Forces, including those currently in combat. GSA counters that Congress and the executive branch are charged with balancing the interests of United States manufacturers, international trade interests, governmental needs, and the public fisc.

---

products in question "constitute 'war materials'").

11. "Carp AFF" refers to Affidavit of Tenley A. Carp, subscribed on July 14, 2004, Exhibit C to Plaintiff's Reply to Defendant's Memorandum in Opposition to Motion for Preliminary Injunction, received on July 15, 2004.

12. "O'Sullivan AFF" refers to Affidavit of Thomas M. O'Sullivan, subscribed on July 15, 2004, Exhibit B to Plaintiff's Reply to Defendant's Memorandum in Opposition to Motion for Preliminary Injunction, received on July 15, 2004.

Congress recognized the importance of materials essential for war, national defense, and national security when it created this exemption to otherwise restrictive trade agreements. The safety of our troops and the safety of the law enforcement community on the homefront and each's ability to perform their mission is paramount and, as Congress has long recognized, greatly outweigh concerns over the origin of the products.

Accordingly the Court FINDS that the Public Interest heavily weighs in favor of Blackhawk.

## II. BLACKHAWK'S LIST

Attempting to revisit an earlier determination that Blackhawk's products did not meet the exemption, Castle–Higgins requested that Blackhawk submit a price list of the items that it want excepted. (Castle–Higgins ¶ 13.) Castle–Higgins and Stoker had agreed "to prepare the documentation to support the exception" and were awaiting the approval of Jerry Ann Foster of the GSA Office of Regional Counsel who would sign upon the receipt of the product listing and a review of the documentation. (*Id.* ¶ 14.) When the list arrived, Foster had "serious concerns about the size of the listing provided." (*Id.* ¶ 15.) Apparently, the "product list was much longer than anticipated and it appeared that Blackhawk was trying to get their entire Brand Line excepted." (*Id.* ¶ 15.) These concerns regarding the number of items for which exemption is sought is well founded. Blackhawk has been instructed to supply the Court with an edited list of its products before the Court will decide the exemption issue at trial.

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

Under the *Blackwelder* analysis, the Court makes the following findings of fact and conclusions of law. Initially, the Court FINDS that granting Blackhawk's preliminary injunction will maintain the status quo. Next, the Court FINDS that there would be irreparable harm to Blackhawk if the preliminary injunction were not granted and that there would be no significant harm to GSA if the status quo were maintained. Accordingly, the Court FINDS that the balancing of the harms weighs in Blackhawk's favor.

As the Court observed at the TRO hearing, the ultimate determination of this issue rests on the appropriate interpretation and administration of the "war materials" exemption within the TAA. The Court FINDS that GSA has adopted no definition of "war materials." The Court further FINDS that the negative definition of "war materials" in the DFAR is ignored by GSA in its determination of whether Blackhawk's products qualified for the exemption. The Court FINDS that there is no established procedure for determining whether to grant the exemption and the procedure as applied is arbitrary and capricious. The Court FINDS that the definitions of "war materials" adopted by the COs, *i.e.*, "used exclusively by the DoD for military purposes in a war environment" (Castle–Higgins ¶ 19), and "used only by the Department of Defense (DoD) and specifically used in a war environment" (2nd Stoker ¶ 11), are unsupported by the definition in the FAR, which provides an exemption, not only for "war materials," but also for "purchases indispensable for national security or for national defense purposes." The Court FINDS that some of Blackhawk's products, while clearly "war materials," may be useful in other contexts. Many of Blackhawk's products "were designed specifically to address deficiencies in standard issue products." (Noell PI [13] ¶ 4.) For example, Blackhawk's

---

**13.** "Noell PI" refers to Affidavit in Support of

Motion for Temporary Restraining Order and

hydration pack may also be useful to border patrol units with the Department of Homeland Security Bureau of Immigration and Customs Enforcement; and Blackhawk's specially designed glove may be useful to duck hunters during cold weather. The possibility of the products' use outside of the war environment does not exclude the products from the definition of "war materials." For these reasons, the Court FINDS that GSA's denial of the exemption and the process through which it was decided were arbitrary and capricious.

Absent contrary evidence, the Court FINDS that when Blackhawk attempted to acquire documentation of its products for exemption from DoD officials, as instructed by GSA, the government attorneys prevented those officials from providing such documentation. A statement from these officials that a certain class of products were "war materials" or "indispensable for national security or defense" without identifying the manufacturer does not appear to demonstrate favoritism. However, Blackhawk must edit its list of products for which it seeks the exemption as directed by the Court.

The Court observed at the TRO hearing that determination of the public interest in this case is a most important factor and heard evidence that GSA's action may affect the war effort and national security if products described by Blackhawk are not readily available. The Court FINDS that the public interest strongly supports granting the preliminary injunction.

### CONCLUSION

■ The balancing of the hardships weighs in Blackhawk's favor, Blackhawk has proffered persuasive evidence regarding the merits of the case, such that the

evidence before the Court supports Blackhawk's likelihood of success on the merits and the promotion of the public interest. Accordingly, Blackhawk's Motion for a Preliminary Injunction is GRANTED. GSA is hereby ENJOINED from removing Blackhawk's products from the FSG 84 Schedule during the duration of this Preliminary Injunction. The $25,000 bond for the TRO that was posted on July 2, 2004 shall serve as the bond for the preliminary injunction. The Court ORDERED that a hearing on the jurisdictional issue raised by GSA be conducted on October 29, 2004 at 10:00 a.m. In preparation for that hearing, GSA was granted leave to file a separate supplemental brief solely on that issue within fifteen (15) days of the July 26, 2004 hearing. If such brief is filed, Blackhawk was granted eleven (11) days from receipt to file a response; and GSA granted five (5) days from receipt of that document to file a reply. At the October 29, 2004 hearing, the parties may present additional evidence by affidavit or testimony as it relates to the Court's factual findings outlined in this order. Additionally, the Court ORDERED that, within thirty (30) days of the July 26, 2004 hearing, Blackhawk file an edited list of its products for which it seeks an exemption, along with an explanation for why each of those products is a "war material." The Government shall have eleven (11) days from receipt of that filing to respond.

The Clerk is REQUESTED to send a copy of this order to all counsel of record.

It is so ORDERED.

Preliminary Injunction by Michael M. Noell, subscribed on July 15, 2004; Exhibit A to Plaintiff's Reply to Defendant's Memorandum in Opposition to Motion for Preliminary Injunction, received on July 15, 2004.